Steel Corporation. We thank the court for its time in light of these somewhat unusual circumstances. While appellants in their briefs seek to portray this appeal as a series of errors by commerce in taking adverse actions against the appellants, what the appellants are actually proposing is a fairly sweeping alteration in the burden of proof that they bear in front of commerce. Commerce's actions are well supported by the record, and U.S. Steel respectfully submits that the Court of International Trade's decisions affirming commerce's remand results can be affirmed and whole. Each of the three issues raised by the appellants shares a common theme and a common flaw. They ask the court to assume the very facts that they need to establish, and they seek a benefit that they're not entitled to. First, appellants demand that all of the untested billet be treated as carbon when the record in fact demonstrates that both carbon and alloy billet was used. They demand that they receive a scrap offset when they can't account for when and from what products the scrap was produced. And they demand that commerce use non-market economy freight charges instead of a more appropriate surrogate simply because the non-market economy freight forwarders were paid in U.S. dollars. To be clear, none of these were adverse actions taken by commerce. With respect to the issue of the carbon versus the alloy billets, we just want to stress that the issue is not whether mill certificates can connect the type of billets used to the steel to the OCTG that was actually produced, or that sampling can never be used in establishing the composition of OCTG. The issue is the connection of the mill certificates to the unsampled quantities. And there is no evidence here that a particular contract number or particular condom is necessarily composed of the same type of OCTG that comes from the same type of billet. We have nothing in the orders. We have nothing in the mill certificates themselves. And we know that these runs took place across a number of months, used, in some cases, six different suppliers of billet and across multiple heats. So we have nothing to say that the OCTG in each condom was identical. There is evidence- Mr. Serhat, would you comment on their concern about taking the average of the surrogate values? Certainly. I think what we have here is what commerce was faced with was evidence going in both directions. There is certainly some evidence from the mill certificates that some of the OCTG, at least the tested OCTG, was composed of carbon, was composed from carbon billet. We also have evidence on the other side that at least some of the contract numbers and some of the OCTG was composed of alloy billet. With the evidence going in both directions and with the appellants taking the extreme position that all of this was, that all of the untested OCTG was carbon, commerce came to a reasonable conclusion to split it in the middle. I think Judge Goldberg described it as a Solomonic solution. The standard of review here is whether or not commerce's determination in that regard was supported by substantial evidence. While you could certainly come to a different conclusion at perhaps a different average or a different conclusion, that's not sufficient to reject commerce's determination. It's not sufficient to disregard the deference that commerce is owed in that respect. I would also like to touch on the issue of the quote-unquote mistake that appellants focus on in their briefing. Respectfully, we believe that this entire argument put forward by the appellants is really a sideshow because to be clear, the statement that the appellants made below prior to the preliminary results proposing an alloy-based surrogate as appropriate for the entirety of the subject merchandise that was not inaccurate, or at least it was not wholly inaccurate. The idea that this contention was a mistake sort of lacks the necessary predicate that it was actually false or that it was actually wrong. In any event, commerce considered whether or not it was a mistake and we believe appropriately rejected that contention based on the progression of the record. They looked at the initial identification as alloy. They looked at the inventory slips. They looked at the incomplete mill certificates and the website screenshots and came to the conclusion that some of this OCTG came from billet that was alloy. If I may move on to the scrap offset issue, we just want to highlight that the appellant the issue here is one of timing and scope. A scrap offset is a benefit that the appellant would be entitled to if they could prove that the scrap was generated during the period of review and if they could show that the scrap was generated from the subject merchandise. You didn't dispute that there should be a scrap offset, is that right? No. I think if you can show that there was scrap generated from the subject merchandise during the period of review, then you are entitled to a scrap offset. If here the only information they provided was not tied to the subject merchandise and it was not tied to the period of review. We don't know, I think more to the point, Commerce looked at it and said we cannot determine where and when this scrap was produced. In other words, there was a lack of proof. Certainly, yes. The appellants here bore the burden below of establishing that offset. Commerce looked at the evidence that they put into the record, determined that they were not entitled to it, that they didn't cross that threshold. Commerce's determination in that regard is due a great deal of deference. Why shouldn't that be estimated just the same way that surrogate value is estimated? Why shouldn't they estimate the... It's a matter of proof because we appreciate their difficulties of tracing particular scrap to particular shipments. I think... I apologize. Please. I think there are scenarios in which it can be estimated and perhaps this is some of the reviews that the appellants point to, for instance, in drawn stainless and multi-layered wood, utility scale wind towers. The respondents there provided information from which an estimate could be derived, from which the information particularly wasn't produced from the subject material, subject goods, wasn't produced during the period of review, that even if you didn't have... Even if you couldn't come to an exact number, you could come to something that Commerce was comfortable with. What we have here is an absence of that where Commerce said, we don't even have enough to make that estimate. I think that's where Commerce found itself and this wasn't a punitive action. The respondents here bore the burden of putting that evidence into the record. Are you saying that with respect to the first issue, there was enough evidence data from which an average could be taken, but not for the scrap? Yes, Your Honor. I think with the first issue, there is sufficient evidence to demonstrate that both carbon and alloy billet was used and Commerce couldn't come to a conclusion that didn't have evidence to say 80-20, 60-40 and so they selected 50-50 as the average that they used. Again, you could possibly come to a different conclusion, but Commerce's determination is entitled to deference. With the scrap, the complete absence of evidence that any of the scrap that was sold, any of the scrap that they're claiming should be used as an offset actually came from the subject materials. We don't have anything tying that scrap that they're claiming to the subject materials. Those are necessary predicates to granting a review or to granting the offset. Okay, thank you. We'll hear from your colleague. Thank you. Mr. Preheim? Good morning. May it please the Court? I don't have anything to add, but I'm certainly happy to entertain any questions the Court may have for the government. Your colleague didn't have time to deal with the freight costs. Perhaps you might address that. Certainly, Your Honor. The statute presumes that government action distorts prices that non-market economy exporters pay for their inputs, but Commerce will normally make an input, value an input purchased from a market economy supplier and paid for in a market economy currency with the price paid to the market economy supplier. Of course, here we had a chain where Chengdi paid a freight forwarder who paid a Chinese agent who then paid a Korean market economy carrier. Now, we had the prices paid from Chengdi to the freight forwarder and the prices paid from the freight forwarder to the Chinese agent, but we simply had no information about how much money was paid from that Chinese agent to the market economy carrier, the Korean carrier, and that's the information that Commerce needs. Now, Chengdi did provide documentation, but all that documentation said was that the payment was made in U.S. dollar settlement, but it didn't provide the critical information, which was the actual amount of the payment. Anything else you need to tell us? I have nothing further. Okay. Thank you. Thank you. We respect the request. Thank you both. Thank you for coming to present the appellee's side. The case is taken under submission.